RENEE AKEN, APPELLANT, V. NEBRASKA METHODIST HOSPITAL, APPELLEE.

511 N.W.2d 762

Filed February 11, 1994.    No. S-92-079.

Virginia L. Cullan and Daniel B. Cullan, of Cullan & Cullan, for appellant.

Kirk S. Blecha, Carol C. Knoepfler, and R.J. (Randy) Stevenson, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

GRANT, J., Retired.

Plaintiff Renee Aken filed her petition in the Workers' Compensation Court on June 13, 1989, seeking compensation from her employer, defendant Nebraska Methodist Hospital (Methodist), for injuries she received on January 5, 1987, while engaged in her employment. On November 30, 1989, the parties stipulated that Methodist had paid temporary total disability benefits and all medical expenses associated with Aken's injury up to that time and that Methodist would continue to pay such expenses and to pay temporary total disability of $180 per week until the compensation court modified or terminated Methodist's obligation. A single judge of the compensation court approved the parties' stipulation and entered an order awarding Aken the benefits, subject to either party's seeking modification of the order.

On May 8, 1990, Aken filed an application requesting pain management treatment for her injuries. On November 29, 1990, Methodist filed its motion, alleging that Aken was not

then totally disabled and was self-employed as a child-care provider in her home. Methodist sought an order terminating its obligation to pay temporary total disability payments to Aken. On December 21, 1990, a hearing was held before a single judge of the compensation court on the parties' respective motions. On March 11, 1991, an order was entered denying Aken's motion, sustaining Methodist's motion to terminate payments, and dismissing Aken's petition of June 13, 1989.

Aken timely sought rehearing of this order before a panel of the Workers' Compensation Court. On January 2, 1992, after rehearing before the panel on June 3, 1991, the single-judge order of dismissal was affirmed by the panel, with one judge concurring with the findings of the majority as to the termination of temporary total disability and dissenting, in part, on the question of Aken's "permanent partial disability, if any." Aken timely appealed to the Nebraska Court of Appeals. On March 2, 1993, the Court of Appeals reversed the compensation court's decision and remanded the cause for further proceedings. This court then granted Methodist's petition for further review. We reverse the judgment of the Court of Appeals and direct that the cause be remanded to the Court of Appeals, where an order shall be entered affirming the order of dismissal entered by the Workers' Compensation Court.

The record shows that Aken was a registered nurse who injured her foot on January 5, 1987, while working for Methodist. As set out above, Methodist paid temporary total disability benefits and medical expenses from January 5, 1987, to March 2, 1991, when the compensation court granted Methodist's motion to terminate all payments and dismissed Aken's petition.

The record of the hearing before the panel shows that Aken had been a floor nurse for Methodist for 9 years prior to her injury. She developed bunions on both feet. On October 29, 1986, a bunionectomy was performed on her left foot. Aken had no postoperative complications from this operation. On November 14, 1986, a bunionectomy was performed on her right foot.

On January 5, 1987, Aken returned to work at Methodist as a registered nurse and on that day, while engaged in the duties of her employment, sustained a stress fracture in her right foot at the site of the operation of November 14, 1986. Doctors later determined that a nerve had been impinged in Aken's right foot and that a tendon had been ruptured. Aken underwent four further surgical operations in 1987, followed by many sessions of physical therapy, a "TENS unit" prescription, two caudal blocks, cortisone injections in her knees, and psychiatric treatments. All of these procedures were attempts to control the pain Aken described to her doctors and to alleviate Aken's depression. The conclusion of Dr. Jack Stark, psychiatric counselor; Dr. David Cornell, podiatrist; and Dr. Timothy Fitzgibbons, orthopedic surgeon, was that Aken was suffering symptoms of a reflex sympathetic dystrophy. Dr. Richard G. Belatti, Jr., an anesthesiologist and director of the Pain Control Center, St. Joseph Hospital, Creighton University Medical Center in Omaha, examined Aken on May 2, 1991, and reported to Dr. Fitzgibbons on May 7, 1991, as follows:

Ms. Aken certainly does give a history which is at least partially suggestive of a reflex sympathetic dystrophy. . . . Interestingly, in the many cases of reflex sympathetic dystrophy I have encountered, after several years of sympathetic dystrophy, the affected extremity is generally grossly atrophic. I would have expected to see severe muscle wasting, bone deformity, nailbed changes, and skin changes. Fortunately, Ms. Aken shows the presence of none of these signs. In essence, the foot appeared to be identical in conformation and muscle mass to the unaffected foot.

To summarize, Ms. Aken has a history which is partially consistent with the diagnosis of reflex sympathetic dystrophy. The physical signs which I would expect to be present at this point do not appear to be so, however. This does speak against a diagnosis of sympathetic dystrophy. Also speaking against the diagnosis of a sympathetic dystrophy is the patient's reluctance to receive any type of medical treatment at this point. My experience with patients with sympathetic

dystrophy has been their overwhelming wish to "try anything" (even amputation) in order to try to attain pain relief. Ms. Aken's reluctance does not fit this usual pattern. At this time, I would like to defer my final diagnosis until Ms. Aken can return for photographs of her discolored extremity, further cutaneous temperature mapping, and/or sympathetic nerve blockage.

Dr. Stark testified in his deposition on May 30, 1991, that he thought Aken could benefit from treatment in a pain management center. In that regard, he testified:

This is something we discussed. I think it's worth trying. I'll be very candid with you. I don't know what to do with this lady. I've had other cases—other sympathetic reflex dystrophy cases. And I talked with Dr. Belatti about it because we're writing a book together. And we both kind of look at each other and say, "Boy, these are the toughest cases to work with." Now, again, not saying that she absolutely does have that.

But in referring her to him - I know Dr. Fitzgibbons - he's one of the best orthopedic surgeons around. And I discussed it informally with him a couple of times. And he's saying, "Geez, I don't know what to do" and looking at me and I'm saying, "I don't know what to do for sure." But I think it would be good to really get this checked out with Dr. Belatti before we try a Pain Clinic . . . .

Other evidence before the panel showed that Aken had cared for preschool children in her home beginning in April 1988. She had some help from her husband and her two school-age children. In 1988, she earned $815 in 9 months. She earned $2,267 in 1989, $6,118 in 1990, and $3,846 up to May 31, 1991.

In additional testimony, James Rogers, a vocational rehabilitation counselor who worked with Aken, concluded that in his opinion Aken could not resume work as a floor nurse, but that "she has the physical capacity to do other areas of employment within her experience." This witness also testified that in August 1989, he asked Aken about doing some work for him in the review of medical records. Aken did not think she could do such work at the time. He also testified that in May 1991, if Aken had expressed any interest in working for

him, he "absolutely" would have offered her some employment in a medical management company that was owned in part by the witness.

In the rehearing before the panel, Methodist did not adduce medical testimony, but offered a "Confidential Report" of a private investigator. The report described surreptitious visual and videotaped surveillance of Aken on October 2 through 7, 11, and 12 and November 17 and 20, 1990. At the rehearing, the parties agreed that exhibit 22, which was received in evidence without objection, was a "composite surveillance videotape of a much longer videotape" that counsel for both parties agreed could be made. Aken states in her brief before this court that Methodist conducted the surreptitious videotaping for more than 60 hours and that the total running time of exhibit 22 was about 32 minutes.

The videotape showed Aken doing various activities such as walking up and down her driveway, carrying a small child, and swinging in a porch swing with a small child on her lap. Approximately one-half of the composite videotape depicts Aken, on October 11, 1990, helping to load a pickup truck in the course of the Aken family's move to a new residence. Aken is shown carrying small boxes; small items of furniture, including a bookcase and two headboards; and other items. Aken is shown carrying the items from the house across a small porch and placing the items in the truck or handing them to her husband. Her gait, carriage, movement, posture, and demeanor, as demonstrated on the tape, are such that a finder of fact could conclude that her actions were done easily, without limping and without any apparent pain or difficulty.

Aken was present at the rehearing. She did not testify in person, nor did her second deposition, taken on November 20, 1990, make any reference to the videotape. Aken did testify that on her "good" days, she limped noticeably and that a layman could see the limp.

Aken's witnesses included Dr. Fitzgibbons, who saw the videotape. His notes of February 18, 1991, stated: "I don't see any definite limp, but I guess all of this probably is not significant to me, because I told her to go ahead and be as active as she can and go on with her life as best she can." Other of

Aken's witnesses viewed the videotape and stated that the video did not change their impression that Aken was totally disabled, because they felt Aken could not work full days and did have good days and bad days.

In its order, the compensation court panel found:

> The evidence presents a question of credibility. The Court received Exhibits 1-23 which included two video tapes showing plaintiff walking briskly and carrying boxes. This evidence is wholly inconsistent with plaintiff's assertions that she must walk on the sides of her feet to avoid pain and must avoid all carrying of groceries and that her pain has completely incapacitated her.

The panel went on to find that Aken "has failed to prove that she continues to suffer from any disability either temporary or permanent" and affirmed the single judge's dismissal of Aken's petition.

Aken then timely appealed to the Court of Appeals, where she assigned two errors, alleging that the compensation court "erred as a matter of law in failing to find that plaintiff remains temporarily totally disabled" and that the compensation court's "finding regarding the nature and extent of plaintiff's disability and need for pain management treatment is contrary to the evidence." The Court of Appeals stated that the record before the compensation court and before the Court of Appeals consisted of "depositions, medical records, medical summaries, and a videotape" and that "[w]here there are no live witnesses at trial, this court is not at a disadvantage in assessing the weight of any testimony or credibility of the witnesses." *Aken v. Nebraska Methodist Hosp.*, 2 NCA 660, 666 (1993). The Court of Appeals stated: "Based on our review of the record, we find that there is not sufficient competent evidence in the record to warrant the making of the compensation court's order . . . ." *Id.* The Court of Appeals reversed the judgment of the compensation court and remanded the cause for further proceedings.

Methodist timely filed a petition for further review of the order of the Court of Appeals, pursuant to Neb. Rev. Stat. § 24-1107 (Cum. Supp. 1992). This petition was granted by this court. Additional briefs were filed, and the case was argued and

submitted.

In its petition for further review, Methodist alleges, in summary, that review is needed because the Court of Appeals used the wrong standard of review when it reweighed the factual findings of the compensation court and because the Court of Appeals failed to follow this court's precedent defining "total disability" in workers' compensation cases. Since we determine that the Court of Appeals did err in reweighing the evidence, we do not discuss the second allegation.

The law in Nebraska is settled, both by statute and by the decided cases, as to the manner in which an appellate court is to review decisions of the Workers' Compensation Court.

Neb. Rev. Stat. § 48-185 (Cum. Supp. 1992) provides in part: "The judgment made by the compensation court after review shall have the same force and effect as a jury verdict in a civil case."

The case law on this point is equally well settled. In *Foreman v. State*, 240 Neb. 716, 720, 483 N.W.2d 752, 755 (1992), quoting from *Roan Eagle v. State*, 237 Neb. 961, 468 N.W.2d 382 (1991), and *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990), we stated:

" ' "Findings of fact made by the Nebraska Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case. [Citations omitted.] In testing the sufficiency of evidence to support findings of fact made by the Nebraska Workers' Compensation Court after rehearing, the evidence must be considered in the light most favorable to the successful party. [Citations omitted.] Factual determinations by the Workers' Compensation Court will not be set aside on appeal unless such determinations are clearly erroneous. Regarding facts determined and findings made after rehearing . . . § 48-185 precludes [an appellate court's] substitution of its view of facts for that of the Workers' Compensation Court if the record contains evidence to substantiate the factual conclusions reached by the Workers' Compensation Court. [Citations omitted.] As the trier of fact, the Nebraska Workers' Compensation

Court is the sole judge of the credibility of witnesses and the weight to be given testimony." ' "

See, also, *Thilking v. Travelers Ins. Co.*, 240 Neb. 248, 482 N.W.2d 548 (1992).

In its decision, the Court of Appeals stated:

There were no live witnesses, and although the single judge referred to a "question of credibility," no issues of live testimonial credibility were presented or resolved by the trial court. Where there are no live witnesses at trial, this court is not at a disadvantage in assessing the weight of any testimony or credibility of the witnesses.

2 NCA at 666.

That statement is incorrect and does not reflect Nebraska law. The proper standard of review is that set out above from *Foreman v. State, supra.*

In her brief before this court, at page 16, Aken contends that "because the facts in this case are written, undisputed, and uncontroverted, the Supreme Court may affirm the Court of Appeals' decision to reassess the credibility and weight of the evidence admitted at trial." Aken cited the case of *State Farm Mut. Auto. Ins. Co. v. Budd*, 185 Neb. 343, 175 N.W.2d 621 (1970). In the *Budd* case, we stated, "If the evidence is entirely written and relates to matters as to which the trial court is in no better position to reach a correct solution than the appellate court, this court will be governed by its own conclusions as to the weight of the evidence." *Id.* at 345, 175 N.W.2d at 623. That statement is not a correct statement of the law, as was noted in *Crawford v. Ham*, 209 Neb. 802, 805, 311 N.W.2d 896, 898 (1981), where we said: "In any event, if the holding of *State Farm Mut. Auto. Ins. Co. v. Budd, supra*, was ever the law of this state, we would limit it to its specific facts. This court does not intend to change the standard of review in law actions."

We note, however, that in *Dugdale of Nebraska v. First State Bank*, 227 Neb. 729, 731, 420 N.W.2d 273, 275 (1988), we again cited the *Budd* case and stated, "Since all of the facts were submitted by stipulation, we review this case as if trying it originally in order to determine whether the facts warranted the judgment." That statement is also incorrect.

We reiterate that the standard for appellate review in all

workers' compensation cases, and in all law cases, is that set out above in *Foreman v. State, supra*. Any holdings to the contrary, on the issue of the scope of appellate review, in *State Farm Mut. Auto. Ins. Co. v. Budd, supra*, and in *Dugdale of Nebraska v. First State Bank, supra*, are overruled. We do not, of course, change in any way a de novo appellate review, as required in equity cases or other statutorily required de novo reviews.

In reviewing the judgment of the Workers' Compensation Court before us and in using the standard of review set out above, we are guided by other general law. First of all, triers of fact, including the Workers' Compensation Court, are not required to take the opinions of expert witnesses as binding. *Briggs v. Consolidated Freightways*, 234 Neb. 410, 451 N.W.2d 278 (1990); *Mulder v. Minnesota Mining & Mfg. Co.*, 219 Neb. 241, 361 N.W.2d 572 (1985). Secondly, the admission of videotape evidence is within the discretion of the Workers' Compensation Court, whose determination with regard to the admission of such evidence will not be reversed on appeal absent a showing of abuse of that discretion. *Briggs v. Consolidated Freightways, supra*; *Harpham v. General Cas. Co.*, 232 Neb. 568, 441 N.W.2d 600 (1989). Thirdly, the weight to be given such videotaped evidence, admitted in evidence, is to be determined by the trier of fact, not the appellate court. *Id*. See *Foreman v. State*, 240 Neb. 716, 483 N.W.2d 752 (1992).

There is no question as to the admissibility of the videotape since it was received in evidence without objection.

In consideration of the videotape evidence, the Court of Appeals stated that

the 15 minutes of videotape [of the Akens' move] in which Aken is engaging in her highest level of activity can only support the conclusion that for 15 minutes out of 11 days of surveillance, Aken could walk and carry a couple dozen boxes of unknown weight out her front door to the tailgate of a waiting pickup truck.

*Aken v. Nebraska Methodist Hosp.*, 2 NCA 660, 670-71 (1993). That conclusion is not warranted. Aken's brief states that the total videotape is approximately 60 hours long. Such a tape realistically could not be viewed in its entirety by a busy Workers' Compensation Court, or any court. Exhibit 22, the

videotape viewed by the court, was a composite, abbreviated tape, agreed to by counsel for both parties. It is a fair assumption that if Aken had been depicted as limping in any part of the videotape, such a segment would have been included in the composite at the demand of Aken's counsel. In addition, the confidential report shows that the moving operation occurred on October 11, 1990, between 1:09 and 1:34 p.m., when Aken and her husband left the residence in the loaded pickup truck, to return at 2:51 p.m., and that Aken helped in reloading the truck between 3:10 and 4:06 p.m., when Aken and her husband again left in the loaded pickup truck, to return at 5:45 p.m.

There was more than sufficient evidence in the record before the Workers' Compensation Court, if believed by the compensation court, to fully support that court's conclusion that the issue of credibility should be decided against Aken. There was sufficient evidence before the compensation court to support the determination in the court's award on rehearing that "plaintiff has failed to prove that she continues to suffer from any disability either temporary or permanent and that defendant's Motion requesting termination of its obligation to pay temporary total disability benefits should be granted."

The decision of the Court of Appeals is reversed, and the cause remanded to that court with directions to affirm the order on rehearing of the Workers' Compensation Court.

REVERSED AND REMANDED WITH DIRECTIONS.

FAHRNBRUCH, J., not participating in the decision.

CAPORALE, J., not participating.